UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JAMES LOCKREM, JR., | CASE NO. C10-0871JLR |
| Plaintiff, | ORDER |
| v. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

## I.  INTRODUCTION

This matter comes before the court on Defendant United States of America's motion for summary judgment (Dkt. # 25). Having reviewed the submissions of the parties and the relevant law, the court DENIES the government's motion.[1]

---

[1] No party has requested oral argument, and the court deems oral argument to be unnecessary here.

## II. BACKGROUND

On Memorial Day weekend in 2008, Plaintiff James Lockrem, Jr. and his family were camping at Mt. Baker National Forest. On May 23, 2008, United States Forest Service Officer Jeremy Smith ("Officer Smith") encounterd Mr. Lockrem, Jr., his brother, Joshua Lockrem, and another individual, Nathan Welch, at their campsite. The campers informed Officer Smith that they had firearms at their campsite, and Officer Smith observed the presence of multiple knives and additional "edged weapons." (Smith Decl. (Dkt. # 27) Ex. A.) Officer Smith also observed an off-leash pitbull-type dog near the campsite. (*Id.*) Officer Smith checked these individuals' identifications with the Whatcom County Sheriff's Office dispatch in order to verify their fishing licenses. (*Id.*) In doing so, he discovered that Joshua Lockrem had an outstanding "misdemeanor probable cause warrant for minor in possession of alcohol." (*Id.*) Officer Smith made the decision not to arrest Joshua Lockrem at that time. (*Id.*)

On May 25, 2008, Officer Smith contacted Whatcom County Sheriff's Deputy Jeremy Freeman ("Deputy Freeman") to ask him to assist in arresting Joshua Lockrem. (*Id.*) Deputy Freeman is the handler of a Whatcom County Sheriff's Department K-9 police dog ("Whatcom K-9"). (*Id.* Exs. A & C.) Officer Smith advised Deputy Freeman that the individuals at the campsite had guns, knives, and dogs. (*Id.* Ex. A.) Deputy Freeman agreed to assist in the arrest. (*Id.* Ex. C.)

When the two officers reached the campsite, they called to Joshua Lockrem and asked him to come up from the campsite to where Officer Smith and Deputy Freeman are standing. (*See* Ex. A.) Officer Smith informed Joshua Lockrem that he was under arrest

and attempted to handcuff him. (*Id.*) Joshua Lockrem resisted arrest, and yelled to his family at the campsite for help. (*Id.*) With Deputy Freeman's assistance, Officer Smith was able to get Joshua Lockrem handcuffed and secured in the patrol car. (*Id.*)

In response to Joshua Lockrem's yells, Mr. Lockrem, Jr., members of his family and other people from the campsite approached the officers. (*Id.*) The individuals were upset and yelling, and they wanted to know what was happening.[2] (*Id.*) A fight ensued between Deputy Freeman and Mr. Lockrem, Jr.'s father, James Lockrem, Sr. (*Id.* Ex. A & B.) As Deputy Freeman wrestled with Mr. Lockrem, Sr., Officer Smith attempted to keep the rest of the group at bay. (*Id.*) Some members of the group failed to comply with Officer Smith's orders to stand back, and he unholstered his Taser and pointed it at those who were closest to where Deputy Freeman and Mr. Lockrem, Sr., were struggling. (*Id.* Ex. A & B.)

At this point, the family's small Pomeranian dog ran near where Deputy Freeman and Mr. Lockrem, Sr. were struggling and begins barking. (Smith Decl. Ex. B.) Mr. Lockrem, Jr.'s sister rushed in near where Deputy Freeman was struggling with Mr. Lockrem, Sr. to retrieve the Pomeranian. (*Id.*)

As Deputy Freeman and Mr. Lockrem, Sr. continued to struggle, Mr. Lockrem, Sr. "unknowingly pushed the remote car door button on [Deputy Freeman's] uniform," and released the Whatcom K-9 from Deputy Freeman's vehicle. (*Id.* Ex. C at 12.) Mr.

---

[2] At about this time, Samson Garner, one of the individuals at the campsite, started to record the incident on a video camera. (*See* Smith Decl. Ex. B (DVD recording of the incident).)

Lockrem, Jr. asserts that "[i]t is unclear what caused the dog's release, but all parties agree the release was unintentional." (Resp. (Dkt. # 30) at 3.) Upon release, the Whatcom K-9 ran toward the family and the area where Deputy Freeman and Mr. Lockrem, Sr. continued to struggle. (Smith Decl. Ex. B.) The Whatcom K-9 appeared to attack the Pomeranian, coming perilously close to Mr. Lockrem, Jr.'s sister as she retrieved the Pomeranian from the fray.[3] (*Id.*) The Whatcom K-9 then began to bite the arm of Mr. Lockrem, Sr. (*Id.*)

There is no evidence of an announcement from either Officer Smith or Deputy Freeman that the dog is a police dog. (*See* Butler Decl. Ex. C (Lockrem, Jr. Dep.) at 57; *see also* Smith Decl. Ex. A; Ex. B; Ex. C.) At the time of the incident, Mr. Lockrem, Jr., did not know that the dog was a police dog. (Butler Decl. (Dkt. # 31) Ex. C (Lockrem Dep.) at 2.) Because it was Memorial Day weekend, there were a lot of people and dogs in the park. (*Id.*) Mr. Lockrem thought that the dog "was someone else's canine that had seen what was going on, got riled up and decided to join in." (*Id.*) After the Whatcom K-9 bit his father, and nearly bites the Pomeranian and his sister, Mr. Lockrem, Jr., grabbed the Whatcom K-9 by its collar and pulled it off of its bite on Mr. Lockrem, Sr.'s arm (*Id.*) Mr. Lockrem, Jr. testified that he "did not in any way know that the canine was a police dog, and grabbing a hold of the collar . . . in [his] mind at the time was for everyone's protection. . . ." (Butler Decl. Ex. C (Lockrem, Jr. Dep.) at 2.) His intent was

---

[3] Mr. Lockrem, Jr. testified that he learned later that the Whatcom K-9 had indeed bit his sister as she attempted to remove the small dog from the area. (Butler Decl. Ex. C (Lockrem, Jr. Dep.) at 56.)

merely to restrain the dog and protect everyone, and he hoped that Officer Smith would assist in restraining the dog. (East Decl. (Dkt. # 26) Ex. 2 (Lockrem, Jr. Dep.) at 7, 10.) Mr. Lockrem, Jr. had experience working with military dogs in Iraq, and therefore knew how to take a dog off its bite by grabbing its collar. (Smith Decl. Ex. C at 15.)

After Mr. Lockrem, Jr., restrained the dog by its collar, Officer Smith ordered Mr. Lockrem, Jr., to lay on the ground and to place his hands behind his back. (Smith Decl. Exs. A & B.) When Mr. Lockrem, Jr. complied, these actions resulted in his release of the dog's collar and his loss of control over the dog. (*Id.* Exs. A & B.) The Whatcom K-9 immediately began to bite Mr. Lockrem, Jr.'s arm while he is on ground, and continued to bite his arm the entire time that Officer Smith is proceeding to handcuff him. (Smith Decl. Ex. B.) Although Mr. Lockrem, Jr., was on the ground and was not resisting as Officer Smith put him in handcuffs, the dog continued to bite his right arm and inflict severe injuries. (*Id.*) Mr. Lockrem, Jr. had difficulty holding his right arm behind his back to allow Officer Smith to handcuff him because the Whatcom K-9 was pulling and biting so severely on his bicep and other areas of his arm. (*Id.*) Although Officer Smith was able to hand-cuff his left wrist, he was unable to hand-cuff Mr. Lockrem, Jr.'s right wrist due to the severe biting and pulling that the dog was doing on Mr. Lockrem's right arm. (*Id.*)

Officer Smith did not take any steps to assist Mr. Lockrem, Jr. or to remove the dog, despite the fact that both Mr. Lockrem, Jr., and other family members were asking him to remove the dog because Mr. Lockrem, Jr. was on the ground in compliance with his orders. (*Id.*) He does not inform Deptuy Freeman (who was continuing to deal with

Mr. Lockrem, Sr.) that the Whatcom K-9 is biting Mr. Lockrem or ask Deputy Freeman to order the dog to release his bite, nor does he attempt to pull the dog off of his bite himself. (*Id.*)

The Whatcom K-9 was trained only to respond to his handler, Deputy Freeman. (East Decl. Ex. 3.) He would not have responded to an order from Officer Smith to release his bite on Mr. Lockrem, Jr. (*Id.*) The Whatcom K-9 was also trained to protect his handler against a potential suspect without ever receiving a command from Deputy Freeman. (*Id.*) The Whatcom K-9 was trained to hold onto a suspect until his handler calls him off. (*Id.*)

At the time that the Whatcom K-9 was biting Mr. Lockrem, Jr., Deputy Freeman was engaged with Mr. Lockrem, Sr. (Smith Decl. Ex. B; Ex. C at 13.) Consequently, it was at least several moments after the Whatcom K-9 first engaged Mr. Lockrem, Jr. before Deputy Freeman realized that the dog was biting him. (Smith Decl. Ex. B; Ex. C at 13; *see also* Mot. at 7.) At this point, Mr. Lockrem, Jr. was on the ground with his left wrist handcuffed and with the dog continuing to bite his right arm and inflict damage. (*Id.* Ex. B.) Deputy Freeman then left Mr. Lockrem, Sr. lying on the ground (not handcuffed), and walked over to the area where Mr. Lockrem, Jr. was also lying on the ground (partially hand-cuffed). (*Id.*) Deputy Freeman was able to release the dog from its bite with a brief voice command. (*Id.* Ex. B; Ex. C at 13.) The dog immediately obeyed Deputy Freeman and released his bite on Mr. Lockrem, Jr. (*Id.* Ex. B; Ex. C at 13.) Officer Smith then completed handcuffing Mr. Lockrem, Jr.'s right wrist. (*Id.* Ex. A at 20; Ex. B.)

Mr. Lockrem, Jr. was brought to Skagit Valley Hospital Emergency Room where he received medical treatment. (*See* Butler Decl. Ex. A.) He suffered ongoing medical treatment, pain and suffering, and permanent disfigurement of his bicep. (*See id.* Ex. F.) He was tried and convicted for criminally obstructing a public servant based on his actions in the incident at issue in this incident. (East Decl. Ex. 4.)

### III. ANALYSIS

**A. Standards**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[4] The moving party bears the initial burden of showing there is no genuine issue of material fact and that he is entitled to prevail as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets his burden, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Cline v. Indus. Maint. Eng'g. & Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 2000). The non-moving party "must make a showing sufficient to establish a genuine dispute of material fact regarding the existence of the essential elements of his case that he must prove at trial." *Galen v. County of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007). "In deciding a motion for summary judgment, the evidence is viewed in the light most favorable to the non-moving party, and all justifiable inferences are to be

---

[4] Rule 56 was revised and rearranged effective December 1, 2010. However, as stated in the Advisory Committee Notes to the 2010 Amendments to Rule 56, "[t]he standard for granting summary judgment remains unchanged."

drawn in [the non-moving party's] favor." *Sluminer v. Verity, Inc.,* 606 F.3d 584, 587 (9th Cir. 2010). Determining credibility, weighing evidence, and drawing of legitimate inferences from the facts are jury functions. *Id.*

### B. Mr. Lockrem, Jr.'s Claim for Negligence

Mr. Lockrem, Jr., has filed his action against the government pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2674. (Am. Compl. ¶ 2.1.) He alleges that Officer Smith owed him a duty of care and that he "breached that duty when he ordered the plaintiff to release the dog and when he ordered the plaintiff to get to the ground so that he could be handcuffed, thus allowing the dog to continue to bite and injure the plaintiff." (*Id.* ¶ 4.2.) Mr. Lockrem, Jr. alleges that Officer "Smith failed to exercise ordinary care in as much as a reasonably prudent law enforcement officer would not have ordered the plaintiff to release the dog and ordered the plaintiff to the ground under similar circumstances." (*Id.* ¶ 4.3.)

To establish the legal underpinnings of this alleged duty, Mr. Lockrem, Jr. cites to several federal cases in which plaintiffs sued for civil damages under 42 U.S.C. § 1983 alleging that a police officer has deprived him or her of a constitutional right. (Resp. at 5-7.) As a general rule, members of the public have no constitutional right to sue state employees who fail to protect them from harm. *L.W. v. Grubbs,* 974 F.2d 199, 121 (9th Cir. 1992). There are, however, two exceptions: (1) the "special relationship" exception, and (2) the "danger creation" exception. *Patel v. Kent Sch. Dist.,* ___ F.3d ___, 2011 WL 2684939, at *4 (9th Cir. July 11, 2011).

A state creates a special relationship with a person when the person is taken into state custody. *Grubbs,* 974 F.2d at 121. Mr. Lockrem, Jr., asserts that a special relationship existed between Officer Smith and himself by virtue of Officer Smith's arrest and detention of him, and Officer Smith's orders that he get on the ground and put his hands behind his back in order to be handcuffed. (Resp. at 7.) Mr. Lockrem, Jr. asserts he was in the custody of Officer Smith, deprived of his liberty, and could do nothing to aid in his own defense. (*Id.*) As a result, Mr. Lockrem, Jr. argues that Officer Smith was under a duty to ensure his safety. *See DeShaney v. Winnebgo Cnty. Dept. of Soc. Serv.,* 489 U.S. 189, 199-200 (1989) ("[W]hen the State takes a person into custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.").

The "danger creation" exception involves affirmative conduct on the part of the state in placing the plaintiff in danger. *Grubbs,* 974 F.2d at 121 (citing *Wood v. Ostrander,* 879 F.2d 583, 588-90 (9th Cir. 1989) (plaintiff not in custody but officer created the danger)). Mr. Lockrem, Jr. asserts that an officer, whose actions place someone in greater danger than they were already in, must act to protect that person from the danger. (*See* Resp. at 5 (citing *Munger v. City of Glasgow Police Dept.,* 227 F.3d 1082 (9th Cir. 2000).) Mr. Lockrem, Jr. argues that when Officer Smith ordered him to lie on the ground and put his hands behind his back for hand-cuffing, this necessarily resulted in Mr. Lockrem, Jr.'s release of the dog. As a result, Officer Smith left Mr. Lockrem, Jr. in more danger than he had been in when he had hold of the Whatcom K-9's collar. (Resp. at 5.) In applying the "danger creation" exception, the court does not rest

its opinion on what options may or may not have been available to the individual, but rather looks to whether the officer left the person in a situation that was more dangerous than the one in which the officer found the person. *Munger,* 227 F.3d at 1086.

The government notes that the foregoing cases arise in the context of claims under 42 U.S.C. § 1983, and therefore may have little or no bearing on the existence of a duty under Washington law concerning negligence. (Reply at 3, n.1.) Nevertheless, Washington case law also supports the existence of a legal duty on the part of Officer Smith. In *Kusah v. McCorkle,* 170 P. 1023 (Wash. 1918), the Washington Supreme Court found that a sheriff "owes the direct duty to a prisoner in his custody to keep him in health and free from harm, and for any breach of such duty resulting in injury he is liable to the prisoner. . . ." *Id.* at 1025. The court stated that the duty "arises out of the special relationship that results when a custodian has complete control over a prisoner deprived of liberty." *Id.*; *see also Gregoire v. City of Oak Harbor,* 244 P.3d 924, 927-28, 929 (Wash. 2010) ("[J]ailors have a special relationship with inmates, creating an affirmative duty to provide for inmate health, welfare, and safety."); *Shea v. City of Spokane,* 562 P.2d 264, 267 (Wash. Ct. App. 1977) ("The duty to the prisoner [to keep him or her in safety] arises because when one is arrested and imprisoned . . ., he is deprived of his liberty, as well as his ability to care for himself."); Restatement (Second) of Torts § 314A (1965) (the duty owed to keep a prisoner safe arises out of the special relationship in which the defendant "voluntarily takes custody of another under circumstances such as to deprive the other of his normal opportunities for protection.") (quoted in *Shea,* 562 P.2d at 267). Accordingly, the court finds that once Officer Smith

arrested Mr. Lockrem, Jr, depriving him of his liberty, his ability to care for himself, and his normal opportunities for protection, Officer Smith owed a duty to Mr. Lockrem, Jr. to provide for his safety. Further, in fulfilling this duty, Officer Smith "is bound to exercise ordinary and reasonable care, under the circumstances of the particular case, for the preservation of his life and health." *Kusah,* 170 P. at 1025.

The government nevertheless argues that it had no duty to stand by and allow Mr. Lockrem, Jr. to restrain the Whatcom K-9. (Reply (Dkt. # 33) at 3.) The court does not disagree. However, at the moment that the government's intervention in the situation included the arrest and detention of Mr. Lockrem, Jr., the law dictates that it acquired a duty to provide for his safety. The government further contends that Officer Smith had no duty to protect Mr. Lockrem, Jr. from a police dog over which Officer Smith had no control. (*Id.* at 13.) The government's assertion is contrary to the law cited above. Once Officer Smith deprived Mr. Lockrem, Jr. of his liberty, Officer Smith acquired a duty to provide for his safety. The court sees no reason why this would not include protection from a police dog in the area.

The government also asserts that Mr. Lockrem, Jr.'s claim should be dismissed because his expert witness, Joseph Kelly, has no relevant experience with police dogs and his testimony concerning Officer Smith's breach of his legal duty to Mr. Lockrem, Jr., is based on speculation.[5] (Mot. at 12-13; Reply at 3.) Even if portions of Mr. Smith's

---

[5] While at least portions of Mr. Kelly's testimony may not be admissible at trial, the government has not moved to exclude his testimony. Because the court need not make a determination concerning the admissibility of Mr. Kelly's testimony for purposes of its decision

ORDER- 11

testimony are too speculative to be admitted at trial, the court does not find that the absence of this testimony requires the entry of summary judgment for the government. The government cites no authority requiring the presentation of expert testimony with regard to Officer's Smith's duty or his alleged breach of that duty. The court finds that, in the circumstances presented here, such expert testimony is not required. The standard of care the jury must apply is straight forward: When Officer Smith ordered Mr. Lockrem, Jr. to the ground, did Officer Smith exercise ordinary and reasonable care to protect Mr. Lockrem, Jr.'s safety under the particular circumstances of this case? *See Kusah,* 170 P. at 1025. The court finds that applying this straight-forward standard of care under the circumstances presented here does not require the testimony of an expert witness, and is not outside the ken of the jury. *See, e.g., Pulido v. City of El Segundo,* 259 Fed. App'x 973, 975 (9th Cir. 2007) (unpublished) (expert testimony not required to prove negligence in matter involving police dog bite); *Hutchens v. Hutchens,* No. CV-05-3580-PCT-DGC, 2007 WL 2320074, at * 2 (D. Ariz. Aug. 10, 2007) (defendants are not entitled to summary judgment because plaintiff did not present expert police testimony where standard of care for police officer is not outside the ken of jurors); *see also Seide v. State of Rhode Island,* 875 A.2d 1259, 1271 (R.I 2005) (expert testimony not required with regard to standard of care in conducting high speed police pursuit); *Coll v. Johnson,* 636 A.2d 336, 338-39 (Vt. 1993) (expert testimony not required concerning standard of care of officers involved in life-threatening situations). Accordingly, the

---

here, it will reserve any ruling on the issue until such time as a motion seeking exclusion of the testimony is properly presented.

government is not entitled to summary judgment on the basis of infirmities in the testimony of Mr. Lockrem, Jr.'s expert witness.[6]

The government also asserts the affirmative defense of assumption of risk. (*See* Mot. at 16-17; Reply (Dkt. # 33) at 4-5.) Even assuming that Mr. Lockrem assumed the risk of a bite when he grabbed the dog's collar, the court thinks the government goes too far by arguing that he assumed the risk of being bitten by a trained police dog in a prolonged manner while being held incapacitated in police custody and unable to come to his own aid. This is particularly so is light of Mr. Lockrem, Jr.s testimony that at the time of the attack he did not realize that the dog was a K-9 police dog.

Under Washington law, "[w]hether a plaintiff decides *knowingly* to encounter a risk turns on whether he or she, at the time of decision, *actually and subjectively* knew all facts that a reasonable person in the defendant's shoes would know and disclose or, concomitantly, all facts that a reasonable person in the plaintiff's shoes would want to know and consider." *See, e.g., Home v. North Kitsap Sch. Dist.*, 965 P.2d 1112, 1119 (Wash. Ct. App. 1998) (italics in original). Further, "[t]he plaintiff must 'be aware of more than just the generalized risk of [his] activities; there must be proof [he] knew of and appreciated the specific hazard which caused the injury.'" *Id.* (quoting *Shorter v.*

---

[6]The same analysis applies with regard to the issue of causation. Even assuming that Mr. Kelly's testimony is too speculative to be introduced at trial, or suffers from some other infirmity, there is sufficient evidence in the record for the jury to conclude that Officer Smith's alleged breach was the proximate cause of Mr. Lockrem, Jr.'s injuries. (*See, e.g.* Smith Decl. Ex. B.) Further, the fact that Officer Smith was not the Whatcom K-9's handler does not necessarily negate causation either. Based on the evidence before the court, a reasonable jury could still find that Officer Smith's alleged breach was the proximate cause of Mr. Lockrem, Jr.'s injuries. (*See id.*)

ORDER- 13

*Drury,* 695 P.2d 116, 123 (Wash. 1985)). In light of Mr. Lockrem, Jr.'s testimony that he did not know that the dog was a K-9 police dog, the court cannot conclude that he actually and subjectively knew all the facts that a reasonable person would want to know or that he knew or appreciated the specific hazard that caused his injury. Accordingly, the court denies the government's motion for summary judgment based on the affirmative defense of assumption of risk.

Finally, the government argues that because Deputy Freeman may be immune from suit as the handler of a police dog under RCW 2.24.410(2), "Plaintiff's attempt to hold Officer Smith liable for the Whatcom K-9's actions is legally untenable." (Mot. at 13.) The court finds no basis in logic or precedent for absolving Officer Smith of his duty with regard to Mr. Lockrem Jr.'s safety on the basis of this narrowly drawn statute of immunity.[7]

---

[7] The court further notes that for the statute to be applicable, the dog handler must "use[] a police dog in the line of duty." RCW 4.24.410(2). The court, however, makes no ruling on whether the statute is applicable where the dog is inadvertently released from a police car without any intention by or direction from the handler. *See id.*

ORDER- 14

## IV. CONCLUSION

For the foregoing reasons, the court DENIES the government's motion for summary judgment (Dkt. # 25.)

Dated this 10th day of August, 2011.

JAMES L. ROBART
United States District Judge